*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

**DISTRICT OF COLUMBIA COURT OF APPEALS**

FILED 09/20/2018
District of Columbia
Court of Appeals

Julio Castillo
Clerk of Court

No. 17-SP-837

REPUBLIC OF SUDAN, MINISTRY OF EXTERNAL AFFAIRS, *et al*., APPELLANTS,

V.

JAMES OWENS, *et al*., APPELLEES.

On Certified Question
From the United States Court of Appeals
For the District of Columbia Circuit
(14-5105)

(Argued February 14, 2018                          Decided September 20, 2018)

*Christopher M. Curran*, with whom *Nicole Erb*, *Claire A. DeLelle*, and *Celia A. McLaughlin* were on the brief, for appellants.

*Matthew D. McGill*, with whom *Stuart H. Newberger*, *Clifton S. Elgarten*, *Aryeh S. Portnoy*, *Thomas Fortune Fay*, *Lochlan F. Shelfer*, *Steven R. Perles*, *Edward B. Macallister*, *Jane Carol Norman*, *John Vail*, *Michael J. Miller*, and *David J. Dickens* were on the brief, for appellees.

*Karl A. Racine*, Attorney General for the District of Columbia, *Todd S. Kim*, Solicitor General at the time the brief was filed, *Loren L. AliKhan*, Deputy Solicitor General at the time the brief was filed, and *Lucy E. Pittman*, Assistant Attorney General, were on the brief for the District of Columbia as amicus curiae in support of appellees.

*Ellen M. Bublick* and *George Anhang* were on the brief for Law Professors Ellen M. Bublick and Paul T. Hayden as amici curiae in support of appellees.

Before FISHER and THOMPSON, *Associate Judges*, and FARRELL, *Senior Judge*.

FISHER, *Associate Judge*: Almost simultaneously on August 7, 1998, al Qaeda terrorists detonated powerful truck bombs outside the United States embassies in Dar es Salaam, Tanzania, and Nairobi, Kenya, killing over two hundred people and injuring more than a thousand others. *Owens v. Republic of Sudan*, 864 F.3d 751, 762 (D.C. Cir. 2017). Three years after the attacks, groups of plaintiffs began filing suit in the United States District Court for the District of Columbia, seeking to hold Sudan accountable for its role in the bombings. *Id.* Eventually, the case reached the United States Court of Appeals for the District of Columbia Circuit and, pursuant to D.C. Code § 11-723 (2012 Repl.), it certified the following question of District of Columbia law to this court:

> Must a claimant alleging emotional distress arising from a terrorist attack that killed or injured a family member have been present at the scene of the attack in order to state a claim for intentional infliction of emotional distress?

*Id.* at 812. For the reasons that follow, we answer this question "No."

## I. Background

The D.C. Circuit and the district court have fully recounted the relevant facts and procedural history, *see id.* at 765–69, 781–84; *Owens v. Republic of Sudan*, 826 F. Supp. 2d 128, 133–35, 139–46 (D.D.C. 2011), *aff'd in part, vacated in part*, 864 F.3d 751 (D.C. Cir. 2017), so we will discuss them only briefly here.

Much of the litigation in federal court centered on the Foreign Sovereign Immunity Act (FSIA), which generally bars suits against foreign sovereigns in federal and state courts. 28 U.S.C. § 1604 (2012). The FSIA contains exceptions, including the "[t]errorism exception," 28 U.S.C. § 1605A, which strips foreign states of immunity, and grants courts jurisdiction, in cases where certain plaintiffs sue state sponsors of terrorism for committing, or "provi[ding] material support" for, enumerated terrorist activities.[1] § 1605A(a)(1), (2). Section 1605A(c) establishes a private right of action for the same conduct that gives rise to jurisdiction; however, only a subcategory of those plaintiffs who obtain jurisdiction

---

[1] In general, the terrorism exception to the jurisdictional immunity of a foreign state applies where plaintiffs seek "money damages . . . against a foreign state for personal injury or death . . . caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act if . . . engaged in by an official, employee, or agent of [a] foreign state . . . designated as a state sponsor of terrorism." 28 U.S.C. § 1605A(a)(1)–(2)(A)(i)(I).

under the terrorism exception can also invoke the statutory cause of action. 864 F.3d at 809. The remainder must assert claims based "upon alternative sources of substantive law," such as state tort law. *Id.* at 808 (analyzing §§ 1605A and 1606).

Appellees are a subset of the plaintiffs who sued Sudan for its role in the embassy bombings. All of them are non-U.S. nationals related to someone who died or suffered injuries in one of the attacks. They allege that the injuries to their family members caused them severe emotional distress, and seek to recover damages for that injury to themselves.

The district court determined, 826 F. Supp. 2d at 148, and the D.C. Circuit later affirmed, 864 F.3d at 769, that it had jurisdiction over appellees' claims under § 1605A. However, the district court also concluded that appellees could not rely on § 1605A(c)'s cause of action and would instead need to invoke an independent legal basis for recovery. 826 F. Supp. 2d at 153. After conducting a choice of law analysis, the court determined that District of Columbia law governed the "claims that [did] not arise under the federal cause of action at § 1605A(c)," *id.* at 157, and, applying our tort law, held Sudan liable to appellees for intentional infliction of emotional distress ("IIED"). *See, e.g., Onsongo v. Republic of Sudan*, 60 F. Supp.

3d 144, 149 (D.D.C. 2014), *aff'd in part, vacated in part sub nom. Owens v. Republic of Sudan*, 864 F.3d 751 (D.C. Cir. 2017).

The orders finding Sudan liable and awarding damages to appellees took the form of default judgments. 864 F.3d at 767. Sudan did not participate in much of the litigation and even declined to engage in the evidentiary hearings held on issues related to jurisdiction, liability, and damages. *Id.* However, after the entry of default judgments, Sudan adopted a more active strategy. It filed motions for relief from the judgments under Fed. R. Civ. P. 60(b), and appealed the denial of that motion, as well as the underlying default judgments, to the D.C. Circuit. *Id.* at 768.

In both proceedings Sudan argued that appellees could recover for IIED only if they were present when their family members were killed or injured, *id.* at 809–10; *Owens v. Republic of Sudan*, 174 F. Supp. 3d 242, 286–87 (D.D.C. 2016), a requirement the district court had not imposed, *see, e.g.*, *Onsongo*, 60 F. Supp. 3d at 149. On appeal, the D.C. Circuit reviewed our case law and was "genuinely uncertain" whether this jurisdiction "would apply the presence requirement in the Second Restatement of Torts to preclude recovery for IIED by family members

absent from the scene of a terrorist bombing." 864 F.3d at 812. Consequently, it certified to us the question of law quoted above. *Id.*

## II. The General Rule

The certified question raises two issues of first impression. We must, as a general matter, identify the elements of an IIED claim arising from injury to a member of the plaintiff's immediate family. Depending on the answer to that question, we may then need to determine whether to permit more expansive liability when injury to the family member was caused by a terrorist attack.

Our analysis starts with § 46 of the Restatement (Second) of Torts (Am. Law Inst. 1965) ("Second Restatement" or "Restatement Second"), which defines the elements of IIED liability as follows:

> (1) One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm.

> (2) Where such conduct is directed at a third person, the actor is subject to liability if he intentionally or recklessly causes severe emotional distress

(a) to a member of such person's immediate family who is present at the time, whether or not such distress results in bodily harm, or

(b) to any other person who is present at the time, if such distress results in bodily harm.

Section 46(1) governs IIED claims where the defendant "intentionally or recklessly causes severe emotional distress" to the plaintiff. In such cases the defendant typically has targeted the plaintiff. *See, e.g.*, *Howard Univ. v. Best*, 484 A.2d 958, 985–86 (D.C. 1984) (holding that plaintiff "made out a prima facie case of intentional infliction of emotional distress . . . [by] demonstrat[ing] repeated 'sexual harassment' by . . . her supervisor"). By contrast, § 46(2)(a) applies when defendants "direct" their extreme and outrageous acts at a third person and "intentionally or recklessly cause[] severe emotional distress" to a member of that person's "immediate family who is present at the time."[2] This court has addressed many § 46(1)-type claims and, in doing so, has expressly adopted the Second Restatement's approach. *See, e.g.*, *Sere v. Grp. Hospitalization, Inc.*, 443 A.2d 33, 37 (D.C. 1982) (quoting elements of IIED from Second Restatement § 46(1)); *Waldon v. Covington*, 415 A.2d 1070, 1076 & n.21 (D.C. 1980) (quoting from § 46

---

[2] It appears that we have not applied § 46(2)(b) in the District of Columbia, and there is no need to discuss that section here.

of Second Restatement). However, none of our published opinions has analyzed an IIED claim where § 46(2)(a) might apply. As a result, before we can discuss cases involving terrorist attacks, we must determine whether § 46(2)(a), and with its requirement that the plaintiff be "present at the time," generally governs IIED claims where the plaintiff's distress was caused by harm to a member of his or her immediate family.

We conclude that it does. As noted, this court has embraced the Restatement Second's approach to IIED liability. Subsection (2)(a) is an integral part of that regime and, in formally adopting that subsection today, we make explicit what our earlier cases implied. This holding is consistent with our customary caution when facing "the problem of potentially infinite liability that has been of central judicial concern in emotional distress cases." *Hedgepeth v. Whitman Walker Clinic*, 22 A.3d 789, 801–02 (D.C. 2011) (en banc). For decades, this court permitted relief for *negligent* infliction of emotional distress only "if the distress result[ed] from a physical impact and [was] accompanied by physical injury." *Id.* at 796. While we ultimately abandoned that rule, we replaced it with new ones deliberately crafted to

contain "self-limiting principle[s]," *id.* at 812, and to avoid "virtually infinite liability," *Williams v. Baker*, 572 A.2d 1062, 1069 (D.C. 1990) (en banc).[3]

Like the rules cabining relief for negligent infliction of emotional distress, § 46(2)(a) defines this related tort to guard against potentially unbounded liability. Indeed, the reporters of the Second Restatement explained that § 46(2)(a)'s "presence" requirement exists, in part, to serve that very goal. § 46 cmt. *l.* Limiting recovery to those who are present and perceive the harm as it happens prevents excessive liability while affording relief to plaintiffs who suffer a uniquely traumatic experience. Accordingly, we hold that, as a general matter, to recover for IIED, a plaintiff whose emotional distress arises from harm suffered by a member of his or her immediate family must be "present" when the harm occurs and otherwise satisfy the rule established in Restatement Second § 46(2)(a).[4]

---

[3] For example, in *Williams*, we held that "[w]here the plaintiff was within the zone of physical danger and as a result of defendant's negligence feared for his or her own safety, . . . it is reasonable to permit the plaintiff to recover as an element of damages mental distress caused by fear for the safety of a member of the plaintiff's immediate family who was endangered by the negligent act." 572 A.2d at 1069. This "zone of danger" test is essentially a requirement that the plaintiff be present.

[4] We adhere to the Second Restatement even though the American Law Institute has published a new version with a slightly modified approach to IIED liability. *See* Restatement (Third) of Torts: Liab. for Physical & Emotional Harm § 46 (2012). This court has proceeded cautiously in adopting the Third

(continued…)

### III.  The FSIA Terrorism Exception to the Presence Requirement

A caveat to § 46 of the Second Restatement leaves open the possibility of "other circumstances" in which a defendant could face liability for IIED, including "situations in which [the plaintiff's] presence at the time may not be required." § 46 Caveat & cmt. *l*.[5]  The D.C. Circuit has asked us to determine whether the caveat applies to the scenario presented here—an IIED case where the defendant is a state sponsor of terrorism denied sovereign immunity by the FSIA.  *See* 864 F.3d at 812.  Having considered the reasons for the requirement in more typical cases, we conclude that presence at the scene is not required in this special context. Accordingly, we answer the certified question in the negative.

---

(…continued)
Restatement.  *See Hedgepeth*, 22 A.3d at 800 n.15 (declining, even while sitting en banc, to endorse more than select comments from the (then-draft) Restatement Third section on negligent infliction of emotional distress).  Moreover, as a panel of the court, we cannot overrule prior decisions that have relied upon § 46(1) of the Second Restatement.  *See M.A.P. v. Ryan*, 285 A.2d 310, 312 (D.C. 1971). Adopting the Restatement Third approach for § 46(2)-type claims would create a confusing and unseemly situation where some IIED claims were governed by the Second Restatement and others by the Third.

[5]  "The Institute expresses no opinion as to whether there may not be other circumstances under which the actor may be subject to liability for the intentional or reckless infliction of emotional distress."  Restatement (Second) of Torts § 46 Caveat (Am. Law Inst. 1965)

The presence requirement serves many purposes. It shields defendants from unwarranted liability, tries to ensure that compensation is awarded only to victims with genuine claims of severe emotional distress, and provides a judicially manageable standard that protects courts from a flood of IIED claims. *See* Restatement Second § 46 cmt. *l.* In FSIA terrorism cases, however, the presence requirement is not needed to achieve these goals: the very facts that justify stripping foreign sovereigns of their immunity allay the concerns that the presence requirement was designed to address. As a result, adhering to the rule in this context would serve only to create a high risk that compelling claims will go uncompensated. By establishing the caveat, the Restatement Second sought to prevent such unfair outcomes; by invoking it here, we do just that.

We begin our analysis by considering the role of the presence requirement in ensuring fairness to defendants. As noted previously, § 46(2)(a) governs cases in which the plaintiffs suffer severe emotional distress from conduct directed at a member of their immediate family. The Restatement Second appreciated that, in such cases, defendants might not anticipate the degree to which their conduct would affect family members absent from the scene—individuals whom such defendants did not target and did not see when they engaged in their extreme and

outrageous conduct. *See* § 46 cmt. *l*. Requiring that the plaintiff have been "present at the time" mitigated this concern. "[W]here, for example, a husband is murdered in the presence of his wife, the actor may know that it is substantially certain, or at least highly probable, that it will cause severe emotional distress to the plaintiff." *Id.* Although § 46(2)(a) separately requires that the defendant "intentionally or recklessly cause" the plaintiff's anguish, the wife's presence at the time gives added assurance that the defendant knew he would cause her severe emotional distress.[6]

Defendants in FSIA terrorism cases do not need this additional protection. Acts of terrorism are, by their very nature, designed "'to create maximum emotional impact,' particularly on third parties." *Estate of Heiser v. Islamic Republic of Iran*, 659 F. Supp. 2d 20, 27 (D.D.C. 2009) (quoting *Eisenfeld v. Islamic Republic of Iran*, 172 F. Supp. 2d 1, 7 (D.D.C. 2000)); *see* 18 U.S.C. § 2331(1) (definition of "international terrorism" includes violent acts that "appear

---

[6] Sudan contends that it did not recklessly disregard the risk that its conduct would harm appellees, much less intend that result. We reiterate that Sudan defaulted on the issue of liability, 864 F.3d at 767, and belatedly challenged the district court's conclusions regarding that issue under the demanding standard of Fed. R. Civ. P. 60(b). Perhaps more importantly, whether Sudan acted with the requisite mental state is beyond the scope of the question certified to us. *See id.* at 812.

to be intended . . . to intimidate or coerce a civilian population . . . [or] to influence the policy of a government by intimidation or coercion"); D.C. Code § 22-3152 (1) (2012 Repl.) ("act of terrorism" similarly defined).  Therefore, when foreign states provide material support for terrorist attacks, it should come as no surprise that the acts they facilitated have caused severe emotional distress to persons who were not present at the time.

Another purpose of the presence requirement is to increase the likelihood that only plaintiffs with "genuine" complaints of severe distress can recover.  *See* Restatement Second § 46 cmt. *l.*  Yet, the risk of trivial or feigned claims is exceedingly low when the anguish derives from a terrorist attack that *killed or injured* a member of the plaintiff's *immediate family*.  Individuals naturally experience severe distress in response to such horrific events.  Consequently, in such circumstances, courts need not rigidly enforce the presence requirement to ward off disingenuous claims.

Lastly, the presence requirement serves the goal of avoiding "virtually unlimited" liability and recognizes "the practical necessity of drawing the line somewhere." *Id.*  Sudan emphasizes this point, arguing that invoking the caveat in this case would untether the tort from judicially manageable standards and

unwisely discard our carefully considered limits on liability for causing emotional distress. Indeed, Sudan suggests that any resort to the caveat is suspect.

We agree that the caveat should be invoked only rarely, but Sudan's argument seems to treat it as a nullity. Relaxing the presence requirement in cases where § 1605A applies should not open the floodgates to litigation. Indeed, the *FSIA terrorism exception* we recognize here is quite limited in scope. The provisions of 28 U.S.C. § 1605A are restricted to (1) plaintiffs who meet precise qualifications, § 1605A(a)(2)(A)(ii); (2) a limited range of conduct (in this instance "extrajudicial killing"), § 1605A(a)(1); and (3) defendants that have been classified as state sponsors of terrorism, § 1605A(a)(2)(A)(i). Our holding excuses the presence requirement only when plaintiffs demonstrate that these predicates are met. And even when they can make such a showing, plaintiffs may obtain relief only upon satisfying the remaining elements of § 46(2)(a)—that is, they must establish that the defendant engaged in "extreme and outrageous conduct" and "intentionally or recklessly" caused the plaintiffs' "severe emotional distress" by harming a member of their "immediate family." These are judicially manageable standards that should be sufficient to prevent a precipitous slide down the proverbial slippery slope.

This analysis demonstrates that when § 1605A applies, the need for the presence requirement does not. In such circumstances, rigid adherence to the rule would do little more than shield culpable defendants from liability and deny relief to deserving plaintiffs. The caveat exists precisely to avoid such unfair results, which is why we choose to invoke it.

Furthermore, precluding liability in contexts like the one at bar is not simply unjust but also unwise, as doing so would forego an opportunity to advance a policy goal of national importance. Congress enacted § 1605A "to deter [sovereign nations] from engaging, either directly or indirectly, in terrorist acts." 864 F.3d at 776. It viewed the goal of deterrence as sufficiently important—and the means of civil liability sufficiently effective—that it curtailed sovereign immunity to promote it. Invoking the caveat here will increase the IIED liability of foreign states if they sponsor terrorism, furthering the objective of deterrence that Congress has emphasized. While § 1605A does not dictate our response to the certified question and we are not obligated to promote the purposes of that statute, it is sound jurisprudence to consider how our decisions will affect policies of national significance. Here, Congress deems civil litigation a useful tool in the

nation's efforts to deter foreign states from sponsoring terrorism. Our holding today is consistent with that legislative judgment.[7]

At the same time, we emphasize that our decision is not based simply on the outrageousness of the actions at issue. Sudan correctly reminds us that conduct must always be "extreme and outrageous" even to make out a prima facie case of IIED. And we take Sudan's point that creating gradations among extreme and outrageous wrongs is a precarious basis for determining whether and when to enforce the presence requirement. Rather, we endorse an FSIA terrorism exception because few IIED claims involve facts that address the concerns of the presence requirement while simultaneously touching a matter of such national significance.

Arguing against excusing the presence requirement, Sudan relies heavily on the note to Restatement Third § 46. There, the reporters reviewed federal district court decisions that have declined or failed to apply the presence requirement in

---

[7] Sudan argues that if Congress wanted appellees and similarly situated plaintiffs to recover damages, it would have made them eligible to plead the cause of action created by § 1605A(c). Instead, it required such plaintiffs to rely on state tort law, which in some instances bars their recovery. However, the fact that Congress left it to the states to decide whether plaintiffs such as appellees may recover in no way suggests that it wanted to *prevent* such plaintiffs from obtaining relief. Nor does that legislative decision curtail our common law authority to shape our own tort law.

terrorism cases and concluded that this trend, although "worthy of note, . . . falls well short of the development of another exception to the presence requirement that the Institute would endorse." Restatement (Third) of Torts: Liab. for Physical & Emotional Harm § 46 reporter's note cmt. *m* (Am. Law Inst. 2012). This statement does not draw our holding into question. The reporters primarily criticized the district courts for treating family members of those harmed in terrorist attacks as "direct" victims under Restatement Second § 46(1), *see id.*, a rationale we do not rely on here.[8]

In sum, this is a situation contemplated by the Second Restatement "in which presence at the time [should] not be required." § 46 cmt. *l.* We see little need to enforce the presence requirement in IIED cases where the jurisdictional elements of § 1605A are satisfied and the plaintiff's severe distress arises from a terrorist attack that killed or injured a member of his or her immediate family. Excusing the presence element in such cases may further deter foreign states from

---

[8] Indeed, we share the reporters' skepticism. Terrorists undoubtedly intend to distress the public at large—see, for example, the definitions of terrorism found in 18 U.S.C. § 2331(1) and D.C. Code § 22-3152 (1), quoted above. Perhaps it could be proven in an individual case (such as hostage taking) that the terrorists intended to cause distress to family members in particular, but we are unwilling to conclude as a matter of law that they do so in all circumstances. In other words, we think this case is governed by § 46(2)(a) of the Second Restatement, not by § 46(1).

sponsoring terrorism and allow deserving plaintiffs to hold culpable defendants accountable for their conduct.  At the same time, making such an exception is not likely to produce the type of unfair and unbounded liability that the presence element is intended to prevent.  In this limited context, therefore, we hold that the presence requirement does not apply.

## IV.  Conclusion

For the reasons stated, we answer the certified question "No."  In accordance with D.C. Code § 11–723 (g) (2012 Repl.), the Clerk is directed to transmit a copy of this opinion to the United States Court of Appeals for the District of Columbia Circuit, to each of the parties, and to *amici*.